**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS**

| | |
|---|---|
| Janie Hawkins, individually and on behalf of all others similarly situated, | 7:21-cv-08788 |
| Plaintiff, | |
| - against - | First Amended Class Action Complaint |
| The Coca-Cola Company, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.      The Coca-Cola Company ("Defendant") manufactures, packages, labels, markets, and sells piña colada flavored soda purporting to have "100% Natural Flavors" under the Fanta brand ("Product").



2.      The piña colada is a cocktail made with rum, cream of coconut or coconut milk, and pineapple juice, usually served either blended or shaken with ice.

3.      The taste of a piña colada is valued so highly that it is associated with non-alcoholic foods, and a flavor in its own right, a combination of pineapple and coconut.

4.      Defendant markets the Product with the prominent statement, "100% NATURAL FLAVORS," above pictures of half a coconut, a wedge of pineapple, and two yellow droplets representing juice from pineapples.



5.      However, the representations are false, deceptive, and misleading because the Product does not contain "100% Natural Flavors," because it contains artificial flavoring ingredients.

## I.      CONSUMER DEMAND FOR NATURAL FLAVORS

6.      Consumers are increasingly concerned about the ingredients added to what they eat and drink.

7.      Surveys have shown that consumers are less likely to buy beverages, even sodas, which have artificial ingredients.

8.      Within the spectrum of artificial ingredients, consumers are especially focused on, and seek to avoid, artificial flavors, and seek products with only natural flavors.

9.     The representation that the Product has "100% Natural Flavors" appeals to the more than seven out of ten consumers who avoid artificial flavors, as these synthetic ingredients are believed to be associated with detrimental health and environmental effects. [1]

10.    Natural flavor is defined as "essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents" from fruits or vegetables, "whose significant function in food is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

11.    Artificial flavor is defined as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R § 101.22(a)(1).

12.    According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[2]

13.    According to Paul Manning, chief executive officer and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[3]

14.    Explanations for why consumers prefer foods containing natural, instead of artificial flavors, are varied.

15.    A recent survey reported that over 82% of US respondents believe that foods with

---

[1] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[2] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.
[3] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

artificial flavors are less healthy than those promoted as containing natural flavors and/or not containing artificial flavors.

16.    Consumers seek to avoid artificial flavors because they are weary of ingredients which are highly processed with chemical additives and synthetic solvents in laboratories.

17.    According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

18.    One scholar theorized "the preference for natural products appeals to a moral ideology and offers a moral satisfaction."[4]

19.    The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[5]

20.    Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[6]

21.    About half of Americans say they seek out natural flavors at least some of the time.

22.    In contrast, artificial flavors were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time.

23.    Nielsen reported that 62% of consumers try to avoid artificial flavors.

24.    New Hope Network concluded that 71% of consumers avoid artificial flavors.

25.    Label Insight determined that 76% of consumers avoid artificial flavors.

---

[4] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147–154. doi:10.1016/j.appet.2004.03.005.

[5] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.

[6] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

26.    A recent survey shows more than three in four people worldwide are convinced that artificial flavors have no place on their ingredient lists.[7]

27.    According to Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors and would pay more for such foods.

## II.    PRODUCT REPRESENTED AS ONLY CONTAINING NATURAL FLAVORS

28.    Defendant markets the Product with the prominent statement, "100% Natural Flavors."

29.    By identifying the Product as having "100% Natural Flavors," with a picture of pineapple and coconut, consumers expect only natural flavors, because that is what the label says.

30.    The digital and/or print marketing includes images of pineapples and coconuts.

 

31.    These representations reinforce the message to consumers that the Product will get its taste from only natural flavoring ingredients.

32.    Though the ingredients include "Natural Flavors," they also include "Malic Acid."

---

[7] What 'Natural' Really Means to Consumers GNT Group's Guide to Global Consumer Demands attests importance of natural colors for future-proof products, July 13, 2017.

**CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, NATURAL FLAVORS, MALIC ACID, MODIFIED FOOD STARCH, POTASSIUM SORBATE AND SODIUM BENZOATE (TO PROTECT TASTE), SUCROSE ACETATE ISOBUTYRATE, GLYCEROL ESTER OF ROSIN, CITRIC ACID.**

CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, NATURAL FLAVORS, MALIC ACID, MODIFIED FOOD STARCH, POTASSIUM SORBATE AND SODIUM BENZOATE (TO PROTECT TASTE), SUCROSE ACETATE ISOBUTYRATE, GLYCEROL ESTER OF ROSIN, CITRIC ACID.

33.     The Product contains almost as much malic acid than natural flavors, as the former is the fourth ingredient list while the latter is listed third, which reflects their order of predominance in the Product.

34.     Unbeknownst to consumers, the ingredient list does not disclose that this malic acid is an artificial flavoring ingredient which provides flavoring to the Product.

35.     Federal and identical state regulations require ingredients to be designated by their specific name instead of their generic name. 21 C.F.R. § 101.4(b).

36.     Defendant only lists "Malic Acid," the generic name for this ingredient, even though its specific name is "DL-Malic Acid."

**III.   MALIC ACID**

37.     A flavor is a substance the function of which is to impart taste. See 21 C.F.R. § 101.22(a)(1) and (3).

38.     Taste is the combination of sensations arising from specialized receptor cells located

in the mouth.[8]

39.     Taste can be defined as sensations of sweet, sour, salty, bitter, and umami.

40.     However, limiting taste to five categories suggests that taste is simple, which is not true.

41.     For example, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

42.     Each of those acids is responsible for unique sensory characteristics of sourness.

43.     Fruit flavors are the sum of the interaction between sugars, acids, and volatile compounds.[9]

44.     Consumer acceptability of the flavor of pineapple and coconut are based on their perceived sweetness and tartness, determined by their sugar to acid ratio.

45.     Sugars, mainly glucose and fructose, and their ratio to acids, such as citric and malic acid, determine the sweetness of fruits.

46.     The table below shows the acid composition of numerous fruits.

Table I.  Acids Naturally Present in Fruits

| Fruit | Predominant Acid | Secondary Acids |
|---|---|---|
| Apple | Malic Acid (95%*) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%*) | Citric Acid, Tartaric Acid |
| Cherry | Malic Acid (94%*) | Tartaric Acid |
| Grape | Malic Acid (60%*) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Lime, Lemon | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%*) | Citric Acid |
| Pear | Malic Acid (77%*) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%*) | Fumaric Acid |

*% of the total acid in the fruit

[8] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).
[9] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

47.   In coconuts, malic acid is the predominant acid while citric acid is a secondary acid.

48.   In pineapples, citric acid is the predominant acid while malic acid is a secondary acid.

49.   Malic acid contributes and enhances the fruity, sweet and sour taste of these and other fruits.

## IV.   CHEMICAL STRUCTURE OF MALIC ACID

50.   Malic acid (molecular formula C4H6O5) is the common name for 1-hydroxy-1, 2-ethanedicarboxylic acid.

51.   Malic acid has two isomers, or different arrangements of atoms in the molecule, L-malic acid, and D-malic acid. 21 C.F.R. § 184.1069.

52.   An isomer is a molecule sharing the same atomic make-up as another but differing in structural arrangements.[10]

53.   Stereoisomers contain different types of isomers, each with distinct characteristics that separate each other as different chemical entities with different chemical properties.

54.   Stereoisomers differ from each other by spatial arrangement, meaning different atomic particles and molecules are situated differently in any three-dimensional direction by even one degree.

55.   An enantiomer is a type of stereoisomer that is a mirror-image and cannot be superimposed.

56.   Enantiomers are like right and left-hand versions of the same molecular formula.

57.   D-Malic Acid and L-Malic Acid are enantiomers.

58.   Below are skeletal formulas of the enantiomers D-Malic Acid and L-Malic Acid.

---

[10] Dan Chong and Jonathan Mooney, Chirality and Stereoisomers (2019).



59.   L-Malic Acid occurs naturally in various fruits, such as those pictured on the Product's front label, and is known for providing sweetness and tartness, among other flavors.

60.   D-Malic Acid does not occur naturally.

61.   D-Malic Acid is most commonly found as a racemic mixture of the D isomer and L isomer, DL-Malic Acid, which is commercially made from petroleum products.

## V.   ADDITION OF DL-MALIC ACID

62.   Adding DL-Malic Acid to a solution of natural flavorings containing L-Malic Acid changes the concentration of malic acid in the solution and the ratio of total malic acid to sugars in that solution.

63.   Natural sugars – like glucose, fructose, and sucrose – combined with artificial DL-Malic Acid in a ratio engineered to resemble the natural chemical combination of sugar and L-Malic Acid found in the characterizing fruit flavors of the Product is not equivalent to the natural flavor of those characterizing fruits and flavors.

64.   A natural chemical combination of sugar and L-Malic Acid, altered by adding artificial DL-Malic Acid, is no longer equivalent to the original chemical combination of sugar

and L-Malic Acid, and therefore no longer the natural flavor of those fruits.

65.    Defendant includes DL-Malic Acid to help make the Product taste tart and fruity, like the pictured fruits taste naturally.

66.    Defendant adds artificial DL-malic acid to the Product to create, enhance, simulate, and/or reinforce the sweet, fruity, and tart taste that consumers associate with the pictured fruits.

67.    Defendant had the option to add naturally extracted L-Malic Acid, a naturally manufactured acid such as citric acid, or natural fruit flavors, including from the fruits pictured, but used artificial DL-Malic Acid because it was likely cheaper or more accurately resembled the flavors of the pictured fruits than citric acid or other acids.

68.    DL-Malic Acid is synthetically produced from petroleum in a high-pressure, high-temperature, catalytic process.

69.    Since there are natural and artificial types of malic acid, laboratory analysis is required to identify which type was used in the Product.

70.    Laboratory analysis concluded this Product contains artificial, DL-Malic Acid, instead of natural, L-Malic Acid.

71.    The Product's labeling, which includes, "Piña Colada," "Piña Colada Flavored Soda With Other Natural Flavors," and "100% Natural Flavors," with pictures of a wedge of pineapple and half a coconut, and two yellow droplets, is misleading because it fails to disclose the addition of artificial flavor in the form of DL-Malic Acid and tells consumers it is flavored only with natural flavors.

## VI.    REQUIREMENTS FOR LABELING

72.    Federal and identical state regulations prohibit false and deceptive identification of the source of a food or beverage's characterizing flavors.

73. The Product's primary or "characterizing" flavor is "Piña Colada," which is understood by consumers to mean pineapple and coconut, the main components of a piña colada, because the label makes "direct or indirect representations" about piña colada flavor, through words, "Piña Colada," and the pictures of pineapple and coconut. 21 C.F.R. § 101.22(i).

74. Federal and identical state regulations require the Product to disclose whether its characterizing flavors are from pineapple and coconut, natural sources other than these fruits, and/or from artificial, chemical sources, such as DL-Malic Acid, from petroleum. 21 C.F.R. § 101.22(i).

75. The lower left corner of the Product states, "Piña Colada Flavored Soda With Other Natural Flavors."



76. This language is required by federal and state regulations where a food or beverage purports to contain some flavor from the characterizing ingredients, i.e., pineapple and coconut, and other flavor from natural sources other than the characterizing ingredients. 21 C.F.R. § 101.22(i)(1)(iii).

77. Since the Product contains artificial flavor, DL-Malic Acid, that simulates, resembles and reinforces the characterizing fruit flavors of a piña colada, the name of the characterizing piña colada flavor is required to "be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Piña Colada Flavored Soda" or "Artificially Flavored Piña Colada Soda" instead

of "Piña Colada Flavored Soda With Other Natural Flavors." 21 C.F.R. § 101.22(i)(2).

78.   DL-Malic Acid is not a "natural flavor" as this term is defined by federal and state regulations, because it is not derived from a fruit or vegetable or any natural source.

79.   A combination of sugar and DL-Malic Acid in a ratio resembling pineapple and coconut flavors cannot be derived from a fruit or vegetable or other natural sources.

80.   A combination of sugar, natural L-Malic Acid, and artificial DL-Malic Acid combined in a way to resemble the natural ratio of sugar and L-Malic Acid found in the characterizing pineapple and coconut flavors of the Product cannot be derived from a fruit or vegetable or other natural source.

81.   A combination of sugars and artificial DL-Malic Acid engineered to resemble the natural ratio of sugars and natural L-Malic Acid that make up the natural flavor of the characterizing fruits of the Product is not a natural flavor.

82.   The natural flavors of the pictured fruits is heavily dependent on specific ratios of sugar and L-Malic Acid, while the Product's flavors depend upon a ratio of sugar and DL-Malic Acid.

83.   DL-Malic Acid could function as a flavor enhancer or PH balancer.

84.   A flavor enhancer is "added to supplement, enhance, or modify the original taste and or aroma of a food without imparting a characteristic taste or aroma of its own." 21 C.F.R. § 170.3(o)(11).

85.   For example, malic acid added to vinegar (ascetic acid) dishes like barbecue pork, coleslaw, or pickled eggs would most likely not fundamentally alter the underlying vinegar flavors.

86.   However, because the flavor imparted by malic acid is a core component of the pictured fruits, DL-Malic Acid does not function as a flavor enhancer.

87. Under these circumstances, artificial DL-Malic Acid fundamentally alters the original combination of sugar and natural L-Malic Acid core to the pictured pineapple and coconut, so that the flavors of the Product are no longer a natural ratio of sugar and L-Malic Acid but instead an artificial ratio of sugar and DL-Malic Acid.

88. PH balancers are "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalis, and neutralizing agents." 21 C.F.R. § 170.3(o)(23).

89. The malic acid used is not a PH balancer because it is not necessary to change or maintain active acidity or basicity in the Product.

90. Irrespective of the purpose Defendant may claim DL-Malic Acid was added to the Product, it has the same effect on its characterizing flavors.

91. Defendant does not have the ability to command DL-Malic Acid to only perform certain functions and is not allowed to decide which malic acid constitutes flavor and which malic acid constitutes only a flavor enhancer or PH balancer.

92. Plaintiff and consumers are unable to learn the malic acid listed in the ingredients is the artificial version without a chemistry kit and detailed knowledge of the relevant regulations.

93. The Product's fruit flavor from DL-Malic Acid resembles the natural characterizing flavors represented to be used.

94. Plaintiff purchased the Product because the packaging claimed it contained "100% Natural Flavors" and that only natural flavors were responsible for the Pina Colada and pineapple and coconut taste.

95. Defendant employs chemists to create the chemical flavor formula of the Product.

96. Defendant knew or should have known that DL-Malic Acid is not naturally occurring, and that by adding DL-Malic Acid, the natural flavorings would be fundamentally

changed.

97.     Defendant knew that DL-Malic Acid would contribute to the tart and fruity fruit taste, and that it was used to enhance the taste of the fruits pictured on the Product.

## VII.  PRODUCT LACKS APPRECIABLE AMOUNT OF PINEAPPLE AND COCONUT INGREDIENTS

98.     The Product has a whitish appearance, similar to that of a piña colada, which, when seen alongside the promise of "100% Natural Flavors" and the pictures of pineapple and coconut, creates the impression it contains some pineapple and coconut ingredients.



99.     Pineapple juice and coconut water are typically sold as "cloudy," due to suspended solids.

100.    However, the Product has no pineapple juice or coconut water, which means its cloudy appearance is from something else.

101.    This appearance is because Defendant added ingredients to simulate what a "cloudy"

mixture of ingredients from pineapple juice and coconut water looks like.

102.   These ingredients include the use of citrus flavoring, as part of the "Natural Flavors" ingredient, which is oily.

103.   The ingredients include sucroseacetate isobutyrate, a weighting agent, which contributes opacity without contributing color in carbonated beverages.

104.   Additionally, this ingredient stabilizes the citrus oils.

105.   The added food starch ingredient, when coupled with the citrus oils, enhances the cloudy appearance of the Product.

106.   The result is a beverage with not even one percent juice from pineapples or coconuts, but with a physical appearance indicating it has real pineapple and coconut.

## VIII. CONCLUSION

107.   Defendant makes other representations and omissions with respect to the Product which are false and misleading.

108.   Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

109.   The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

110.   Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

111.   Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

112.   As a result of the false and misleading representations, the Product is sold at a

premium price, approximately no less than no less than $2.29 for 20 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

113.   Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

114.   The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

115.   Plaintiff Janie Hawkins is a citizen of New York.

116.   Defendant The Coca-Cola Company is a Delaware corporation with a principal place of business in Atlanta, Fulton County, Georgia.

117.   The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

118.   The members of the classes Plaintiff seeks to represent are more than 100, because the Product is available at thousands of locations within the States which Plaintiff seeks to represent, due to the market power of Defendant and the ubiquity of its products with the representations described here.

119.   The Product is available to consumers from third-parties, which includes grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and/or online

120.   Venue is in the White Plains Courthouse in this District because a substantial part of the events or omissions giving rise to these claims occurred in Rockland County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of

and with the issues described here.

<u>Parties</u>

121.   Plaintiff Janie Hawkins is a citizen of Spring Valley, Rockland, New York.

122.   Plaintiff seeks to avoid artificial flavoring for the reasons described here, including believed negative health effects, avoidance of chemicals and synthetic ingredients, and negative environmental impact of their production.

123.   Defendant The Coca-Cola Company is a Delaware corporation with a principal place of business in Atlanta, Georgia, Fulton County.

124.   Fanta was first made in Europe during the Second World War by The Coca-Cola Company's European divisions.

125.   The version of Fanta sold today is based on the Fanta that was re-introduced to Italy in the mid-1950s.

126.   This soda was unique because it was made with local produce instead of only sugary syrups.

127.   Fanta has always been known as a more "natural" and fruit-centric brand of soda than American soda brands, due to its European origins.

128.   In the United States, Fanta sodas are based on real fruit flavors, and have bright colors for their marketing.

129.   Consumers trust the Fanta brand to be honest with them, because they have built up a reservoir of good will when it comes to vitamins.

130.   The Product is available to consumers from third-parties, which includes grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and/or online.

131.   Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including ShopRite, 250 Route #59, Tallman, NY 10901 in October 2021, and/or among other times.

132.   Plaintiff believed and expected the Product contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did because that is what the representations and omissions said and implied.

133.   Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

134.   Plaintiff bought the Product at or exceeding the above-referenced price.

135.   Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

136.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

137.   The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

138.   Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

139.   Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar sodas represented as made with only natural fruit flavors and/or fruit ingredients,

because she is unsure whether those representations are truthful.

Class Allegations

140.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Arkansas, West Virginia, and Iowa, who purchased the Product during the statutes of limitations for each cause of action alleged.

141.   Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

142.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

143.   Plaintiff is an adequate representative because her interests do not conflict with other members.

144.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

145.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

146.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

147.   Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

<u>(Consumer Protection Statute)</u>

148.   Plaintiff incorporates by reference all preceding paragraphs.

149.   Plaintiff believed the Product contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

150.   Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

151.   Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

152.   Plaintiff relied on the representations and omissions to believe the Product contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

153.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

154.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

155.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

156.   Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

157. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

158. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

159. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

160. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

161. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

162. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

163. Defendant's representations affirmed and promised that the Product contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

164. Defendant described the Product so Plaintiff and consumers believed it contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did, which became part of the basis of the bargain that it would conform to its affirmations and promises.

165. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

166.   This duty is based on Defendant's outsized role in the market for this type of Product, as custodian of the Fanta brand of beverages, known as the preeminent seller of natural fruit-flavored sodas.

167.   Plaintiff recently became aware of Defendant's breach of the Product's warranties.

168.   Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

169.   Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

170.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

171.   The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

172.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

173.   The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

174.   Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

Fraud

175.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained only natural flavoring, and contained more of the referenced fruit ingredients, than it did.

176.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

177.   Defendant knew of the issues described here yet did not address them.

178.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

179.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the

applicable laws;

4.  Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   April 8, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
T: (516) 268-7080
spencer@spencersheehan.com

Shub Law Firm LLC
Jonathan Shub
Kevin Laukaitis*
134 Kings Hwy E Fl 2
Haddonfield NJ 08033
T: (856) 772-7200
jshub@shublawyers.com
klaukaitis@shublawyers.com

*Pro Hac Vice Application Pending or Forthcoming